IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NUTRIEN AG SOLUTIONS, INC., | ) | |
| f/k/a CROP PRODUCTION | ) | |
| SERVICES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-614-WKW |
| | ) | [WO] |
| FRANKLIN BRUCE SIMMONS, III, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Franklin Bruce Simmons, III, has been farming for three decades. In 2018, he moved his farming operations from Ohio to Alabama and settled on more than a thousand acres in Montgomery County. He had high hopes for a high soybean yield, but unseasonably rainy weather at harvest time ruined most of his crop. Without a cash crop, he became delinquent on his credit account with Nutrien Ag Solutions, Inc., formerly known as Crop Production Services, Inc. ("Nutrien" or "CPS"). Nutrien brought this suit against Mr. Simmons to recoup the debt for the soybean seeds and for other agricultural products and services. Mr. Simmons raised the defense of fraud in the inducement to enter into the credit agreement. He also counterclaimed for negligent and reckless misrepresentation pertaining to several side agreements he says he entered into with Nutrien's sales representative.

At the conclusion of discovery, Nutrien moved for summary judgment, requesting entry of judgment in its favor for the debt and on the counterclaims. (Doc. # 37.) That motion, which is opposed, has been fully briefed. (Docs. # 38, 41, 44.) After careful consideration of the arguments, evidence, and the law, the court finds that Nutrien's motion for summary judgment is due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Alternatively, a movant who does not have a trial burden of production can

assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex Corp.*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs. Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

### A.    <u>The Parties</u>

Nutrien is a provider of crop inputs and agricultural services for farmers.  Nutrien employed Brad Smith as a sales representative.  Mr. Simmons conducted business with Mr. Smith for his farming products and services, and Mr. Smith was the sales representative responsible for Mr. Simmons's account with Nutrien.

Mr. Simmons is an experienced farmer, having farmed for more than thirty years.  He also has a Ph.D. in Economics, a J.D., an LLM, and a Master's in Theology.  (Def. Dep., at 14, 23, 25, 29.)

**B.**     **The Written Contract and Invoices**

In 2018, Mr. Simmons entered into a commercial credit agreement with Nutrien for the purchase of soybean seeds, chemicals, and fertilizer for 1,100 acres. This agreement, titled a "Customer Profile," included Mr. Simmons's business, financial, and farming information and incorporated the terms and conditions of the credit agreement.  Under the agreement, which had a credit limit of $100,000, Mr. Simmons established a single account based on his written guaranty of the account with Nutrien.  The guaranty provided that Mr. Simmons

> guarantee(s) the payment . . . and assume(s) personal liability for the payment . . . of all obligations due and owing CPS for products and services to Applicant(s) pursuant to this request for credit. . . .  This guaranty is absolute, unconditional, and continuing and shall remain in effect until Applicant's (s') obligations have been paid, performed, and discharged in full.

(Doc. # 1-1, at 2 (henceforth "the Contract").)  The Contract further provided that "[t]he terms of payment will be specifically indicated on your invoices."  (Doc. # 1-1, at 3.)  The invoices set out that payment was due in full, and typically it was "payable on the 10th of the month following the statement date."  (*See, e.g.*, Doc. # 38-1, at 14.)  Payments not made "by the 25th of the month following the statement date" incurred a five percent late fee.  (*See, e.g.*, Doc. # 38-1, at 14.)  Both the

4

Contract and the invoices provided that any invoice not paid in full by the due date also would be assessed a finance charge.  The maximum finance charge was 18% per year (1.5% monthly).  (Contract, at 3.)  Under the Contract, Mr. Simmons further agreed to pay Nutrien's reasonable attorneys' fees, plus all costs of collection. (Contract, at 2.)  In his counterclaim, Mr. Simmons admits that he signed the Contract.[1]  (Doc. # 11, at 7 ("Simmons executed the Customer Profile, which is attached to the Complaint as 'Exhibit A.'").)

## C.   Mr. Simmons's 2018 Soybean Crop

According to Mr. Simmons's testimony, in late June 2018, Mr. Smith told him that farmers "only plant long season beans in Alabama."  (Def. Dep., at 131.)  Mr. Smith recommended that Mr. Simmons plant "long season" (also called "full season") soybean seeds and assured him that the conditions for harvesting the soybeans would be dry enough in November to ensure a successful crop.[2]  (Def. Dep., at 131, 187.)  That turned out not to be the case.

---

[1] There is some confusion in the record as to the date Mr. Simmons signed the Contract—whether he signed it in April 2018 or whether he signed it in July 2018 and backdated it to April 2018.  His summary judgment response confirms though that there is no dispute that he signed the Contract:  "Whether Simmons signed the CPS customer profile in April or July of 2018 is not relevant to the outcome of this case because Simmons admits that he signed the customer profile in July 2018."  (Doc. # 41, at 8 n.3.)

[2] Nutrien contests the use of the nomenclature as "full season" or "long season" soybean seed.  It is undisputed that Nutrien sold Simmons a Group 5 maturity soybean, which Mr. Simmons calls a "full season" or "long season" seed, but that Mr. Simmons contends that Nutrien should have sold him Group 1.8 or 1.9 maturity soybean seeds, which Mr. Simmons calls "short season" seeds.  (Def. Dep., at 131; Def. Dep., at 183 (testifying that "long season" soybean seed in Alabama includes Groups 5, 6, and 7; Smith Dep. at 77–78).)  Because Mr. Simmons incorporates "full

Mr. Simmons planted "full season" soybean seeds on his farm.  But November 2018 averaged more rain than expected.  (Doc. # 38-8, at 6.)  The wet harvest season ruined most of the soybean crop, and Mr. Simmons was able to successfully harvest only 101 acres of the soybeans planted.  (Doc. # 11, at 8.)  As a result, Mr. Simmons did not generate enough cash to pay Nutrien for the fertilizer, chemicals, and soybean seed in December.  (Doc. # 11, at 8.)

**D.   The Unpaid Invoices**

In 2018, during the soybean planting and harvest season, Nutrien sold and delivered soybean seeds, fertilizers, chemicals, and services to Mr. Simmons for his farming operations through a series of orders and deliveries.  Each sale or service and the amount due was set out on an invoice issued by Nutrien.  (Doc. # 38-1.)  Fifteen invoices remain unpaid, with a principal balance totaling $110,746.89.  The statement dates on the unpaid invoices range from June 25, 2018, to August 6, 2018.  (*See* Doc. # 38-1, at 11–26.)  These invoices were "transmitted to [Mr. Simmons] at the address provided by [him], with sufficient postage paid," and some invoices "were delivered to Mr. Simmons by Nutrien employee, Brad Smith."  (Doc. # 38-1, at 4 (Glass Aff.).)  Nutrien has "no record of Mr. Simmons disputing the invoices or rejecting delivery of goods prior to service of his lawsuit."  (Doc. # 38-1, at 4.)

---

season," "long season," and "short season" in his counterclaim and uses them during his deposition, this opinion does likewise.

Additionally, Mr. Simmons admits that he ordered and received all the products reflected in the fifteen unpaid invoices, some at the "recommendation of Brad Smith." (Doc. # 38-7 (Def.'s Responses to Pl.'s Requests for Admissions).)  Nutrien sent Mr. Simmons a demand latter, dated June 19, 2019, for the full amount of the debt.  (Doc. # 38-1, at 29.)  That demand letter went unanswered.

## E.    <u>The Side Agreements</u>

Mr. Simmons argues that, notwithstanding the Contract and invoices, he had three additional agreements with Nutrien, one written and two oral.

### *1.    Mr. Smith's Alleged Agreement that Nutrien Would Cancel the Debt Owed for the Soybean Seeds if the Crop Failed*

Mr. Simmons says that Mr. Smith orally assured him that if he were unable to harvest the "full season" soybeans due to wet conditions in November 2018, Mr. Simmons would not have to pay Nutrien for invoiced seeds.  (Def. Dep., at 146–47; Doc. # 11, at 7–8; *see also* Doc. # 41-3, at 2.)  Mr. Simmons also says that he secured Mr. Smith's oral promise in writing.  Specifically, Mr. Simmons has produced a page from his steno pad that contains his notes memorializing his discussions with Mr. Smith.  This page, which is dated June 1, 2018, includes a bracketed phrase that states:  "late season beans—if not harvest, not owe! → claim: Nov, you can harvest." (Doc. # 41-6.)  Mr. Simmons testified that he handed Mr. Smith his steno pad and that, when Mr. Smith returned the steno pad, Mr. Smith's name was written on the

page.  (Def. Dep., at 151.)  However, Mr. Simmons "did not see him sign it."  (Def.

Dep., at 151 (citing Ex. F below).)



Hence, according to Mr. Simmons, Nutrien agreed in writing to cancel the debt he

owed for the soybean seeds if the soybean seeds did not yield a successful crop due

to adverse weather conditions, yet he was charged for the seeds.

Mr. Smith denies that he told Mr. Simmons that he would not have to pay for

the soybean seeds he purchased if the crop failed.  (Smith Dep., at 78–79.)  However,

assuming that the representation was made for purposes of summary judgment,

Nutrien counters that the statute of frauds bars enforcement of this alleged

agreement.  (Doc. # 38, at 30–31.)

### 2.     *Mr. Smith's Alleged Oral Representations About Price Matching*

Mr. Simmons testified that, in late May or early June 2018, Mr. Smith orally agreed to match the prices that Mr. Simmons could obtain from his Ohio suppliers. However, Nutrien did not honor the price-match agreement and later invoiced him at higher prices.  (Def. Dep., at 169–70; Doc. # 41-4.)  As a result, Mr. Simmons says that Nutrien overcharged him by more than $25,000 for the soybean seeds. (Doc. # 41, at 5.)

Whether Mr. Smith promised Mr. Simmons to match prices is in dispute.  The dispute is not material, according to Nutrien, because Mr. Simmons could not have reasonably relied on a representation that Nutrien would match the Ohio distributor's prices because price matching was not a payment term specified in the Contract or invoices.  Alternatively, Nutrien points out that this assertion "was also never plead anywhere in his answer or counterclaim and should be disregarded."  (Doc. # 44, at 9–10 (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.")).)

### 3.     *Mr. Smith's Alleged Oral Representations that All Credit Purchases Would Have Zero Percent Interest for Six Months*

Mr. Simmons testified that, in July 2018, Mr. Smith told him that his credit purchases would be part of "an interest free program for six (6) months," with

payment due in December.  (Doc. # 11, at 2; *see also* Def. Dep., at 123, 170–71; Doc. # 41, at 5.)  Mr. Simmons elaborated that "the deal" he had with Mr. Smith was that he had until December 2018, after the harvest, to pay for the Nutrien products and services and that the debt owed would be "interest free."  (Def. Dep., at 123, 132–33.)  Yet, it is undisputed that Nutrien charged him interest during that six-month period.  (Doc. # 41, at 5; Doc. # 38-1.)

Nutrien does not dispute that Mr. Smith and Mr. Simmons discussed Nutrien's zero percent interest program.  Nutrien has submitted evidence that, on March 18, 2018, Mr. Smith emailed Mr. Simmons, stating that "[w]e offer a 0%, due November of 2018 for all Asgrow, Dekalb, Dyna Gro. & Syngenta Seed purchased."  (Doc. # 44-1, at 2.)  Mr. Smith attached the "AFS Credit Application Form" to the email. (Doc. # 44-1, at 2, 3–4.)  At his deposition, Mr. Simmons admitted that he received the email from Mr. Smith, but he testified that he was unable to open attachments to emails at that time (March 2018) and thus did not retrieve the form.  (Def. Dep., at 284–85.)  It is undisputed that Mr. Simmons did not complete and sign the application for the zero-interest payment program.  (Def. Dep., at 358–59, 284–85; Smith Dep., at 51–53.)

## F.   **The Lawsuit**

In August 2019, Nutrien filed this lawsuit to collect the debt it says Mr. Simmons owes under the Contract and unpaid invoices.  The Complaint contains

five claims—for goods sold and delivered (Count 1), for open account (Count 2), for account stated (Count 3), for unjust enrichment (Count 4), and for breach of contract (Count 5).   Nutrien alleges that Mr. Simmons owes the principal sum of $110,746.89, with an interest rate of eighteen percent per annum, plus attorneys' fees, and costs.  (Doc. # 38, at 16.)

Mr. Simmons's Answer pleads the affirmative defense of fraudulent inducement:  "Plaintiff fraudulently induced Simmons into buying 'full season' soybean seed in the summer of 2018 and under an interest free program for six (6) months."  Doc. # 11, at 4 (Answer/Counterclaim)  Mr. Simmons also brings two counterclaims, one for negligent misrepresentation and the other for reckless misrepresentation.  As for the counterclaims, Mr. Simmons alleges that Mr. Smith, on behalf of Nutrien, negligently and recklessly "misrepresented the type of soybean seed that Simmons should plant in late June of 2018 on his farm in Montgomery County."  (Doc. # 11, at 9.)  He contends that Nutrien held itself out as an expert on soybean seed selections, that he reasonably relied on Mr. Smith's recommendation to plant "full season" soybeans, and that he has suffered damages exceeding $250,000.  (Doc. # 11, at 9–10.)  He further alleges that, if he had planted "short season" soybean seeds, "the crop would have been harvested in September of 2018 and [he] would have generated sufficient funds to pay the Plaintiff and other creditors."  (Doc. # 11, at 8.)

11

Nutrien now moves for summary judgment in its favor for the debt at issue on its claims for breach of contract and for breach of open account/account stated. It also moves for summary judgment on Mr. Simmons's counterclaims. (Doc. # 38.) Mr. Simmons opposes the motion. (Doc. # 41.)

## IV. DISCUSSION

### A. <u>Choice of Law</u>

The parties have argued their respective positions based upon Alabama law. Their reliance on Alabama law is correct. "[A] federal court sitting in diversity will apply the choice of law rules for the state in which it sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Alabama follows the principle of 'lex loci contractus,' which states that a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991) (citations omitted). Because no state's law is specified in the contractual documents and the parties have not argued otherwise, the "contract is governed by the laws of the state where it is made." *Id.* The contract was made in Alabama, and the sales of goods and services were made to Mr. Simmons in Alabama. Alabama law thus applies.

**B.**   **Breach of Contract**

Nutrien has established a prima facie case of breach of contract under Alabama law.  "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."  *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020).

The first element is satisfied.  Mr. Simmons admits in his Counterclaim and reaffirms in his summary judgment response that Nutrien and Mr. Simmons entered into a valid Contract.  (Doc. # 11, at 7, ¶ 11; Doc. # 41, at 8 n.3.)  Under the Contract, Nutrien provided agricultural goods and services to Mr. Simmons on credit for his farming operations, and Mr. Simmons guaranteed "the payment and performance of all obligations due and owing [Nutrien] for products and services to [him] pursuant to this request for credit."[3]  (Contract, at 2.)  There is no genuine dispute of material fact as to the first element of a claim for breach of contract under Alabama law.

---

[3] As Nutrien points out in its opening summary judgment brief, Mr. Simmons attempted to contradict his pleading during his deposition by testifying that the contract attached to the Complaint was not the contract he signed. (*See* Def. Dep., at 105–06, 122-23; *see also* Def. Dep., at 113 (testifying that he "has not been able to find" the contract he signed).)  However, his summary judgment response does not rely on or mention that testimony, and for good reason.  As the Eleventh Circuit has recognized, "a party is bound by the admissions in his pleadings," *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983), and "facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them," *id.* (citations omitted).  Mr. Simmons's admission in his Counterclaim is a judicial admission under Eleventh Circuit law and binds Mr. Simmons.  Alternatively, Mr. Simmons has abandoned any challenge to the validity of the Contract.

The second element is satisfied.  Nutrien performed under the contract.  It provided goods and services—including soybean seeds and fertilizers—to Mr. Simmons.  (*See* Doc. # 38-1 (invoices and account statements); *see also* Doc. # 11, at 3 (¶ 20), in which Mr. Simmons "[a]dmit[s] that fertilizer, chemicals and seed were delivered/provided to [him]" by Nutrien).)  There is no genuine dispute of material fact as to the second element of a claim for breach of contract under Alabama law.

The third element is satisfied.  Nutrien has submitted copies of the outstanding and unpaid invoices.  (*See* Doc. # 38-1, at 4, at 11–27.)  Mr. Simmons does not dispute that he is indebted to Nutrien for goods and services that Nutrien sold him; he disputes only the amount of that debt.  (*See, e.g.*, Doc. # 11, at 8 ("Simmons did not generate enough cash to pay Plaintiff for the fertilizer, chemicals and soybean seed in December [2018] or his other creditors.").)  There is no genuine dispute of material fact that Mr. Simmons has not performed under the Contract as required by the third element of a claim for breach of contract under Alabama law.

The fourth element is the only element in dispute.  Mr. Simmons does not dispute that he owes a debt to Nutrien, but he does dispute the amount of that debt. In his brief in opposition to summary judgment Mr. Simmons argues that his three side agreements with Mr. Smith show why the amount of damages owed on the debt is in dispute.  (*See* Doc. # 41, at 4–6.)  As a fourth argument, Mr. Simmons argues

that Nutrien overcharged him for application services, for fertilizer, for chemicals, and for soybean seeds because unbeknownst to either Nutrien or Mr. Simmons at the time, he had 927 tillable acres on his farm, but was charged based upon 1,100 acres. The law as applied to the evidence, viewed in the light most favorable to Mr. Simmons, dispels that the dispute is genuine.  These arguments now will be analyzed.

### 1.    Mr. Smith's Alleged Agreement that Nutrien Would Cancel the Debt Owed for the Soybean Seeds if the Crop Failed

According to Mr. Simmons, Nutrien agreed to cancel the debt he owed for the soybean seeds if the soybean seeds did not yield a successful crop due to adverse weather conditions, yet he was charged for the seeds.  Nutrien argues that this alleged agreement "to forgive or otherwise waive its right to collect the debt Simmons owed" is unenforceable under Alabama's general statute of frauds, namely, Alabama Code § 8-9-2(7).  (Doc. # 38, at 30.)  Mr. Simmons counters that the statute of frauds "is a nonissue" because there is a writing that "memorialized the agreement between Simmons and CPS regarding the payment for the seed to be sold on credit."  (Doc. # 41, at 16.)  As evidence of the writing, Mr. Simmons relies on the note in his steno book—"late season beans—if not harvest, not owe!  → claim: Nov, you can harvest"—in conjunction with Mr. Smith's handwritten name on the steno page. (Doc. # 41-6; Def. Dep., at 146–47, 151.)

The disposition of this issue turns on whether the written document allegedly cancelling the debt Mr. Simmons owed Nutrien based on the extension of credit for the soybean seeds is enforceable under Alabama's general statute of frauds, Ala. Code § 8-9-2(7).  Section § 8-9-2 of the Alabama Code provides that specified oral contracts are unenforceable.  Relevant here, "[e]very agreement or commitment to lend money, delay, or forbear repayment thereof" is void "unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing."  Ala. Code § 8-9-2(7).  Mr. Smith's agreement to "forbear repayment" of Mr. Simmons's indebtedness must comply with the strictures of § 8-9-2(7) to be enforceable.

The Alabama Supreme Court has explained that "[i]n order to take an otherwise valid oral contract out of the operation of the statute of frauds . . . , the [writing] must state all essential elements over the signature of the party to be charged, including, but not limited to, the element of consideration."  *Bussey v. John Deere Co.*, 531 So. 2d 860, 863 (Ala. 1988) (addressing the element of consideration under Alabama's general statute of frauds and under the statute of frauds contained in Alabama's Uniform Commercial Code).  Additionally, "the authority of an agent to bind his principal . . . must also be in writing—otherwise, the contract is void." *Altmayer v. City of Daphne*, 613 So. 2d 366, 369 (Ala. 1993) (citing *Cammorata v.*

*Woodruff*, 445 So. 2d 867, 872 (Ala. 1983)).  The theories of implied and apparent authority of an agent do not apply "to a situation which falls within the statute of frauds." *Cammorata*, 445 So. 2d at 872.

Based on the foregoing principles, the steno page fails for lack of consideration and for lack of written authority to bind Nutrien to the agreement. First, this writing is not supported by any consideration.   Although the parties have not cited a decision directly on point, and independent research uncovered no decision, § 8-9-2 requires a writing evidencing consideration for each type of contract specified; hence, *Bussey*'s holding that a written agreement under § 8-9-2(1) was unenforceable for lack of consideration is instructive.  There, a John Deere equipment dealer sued John Deere Company for breach of a dealership agreement. Under the agreement, memorialized in a series of letters, John Deere assured the dealer that if he constructed a new building for the dealership, John Deere would increase his inventory until the building was paid off.  After the dealer's completion of the building, John Deere did not provide any additional inventory.  In defense of the claim for breach of the dealership, John Deere relied on the parties' written agreement, which provided that John Deere was not "responsible for delay or failure to ship caused by unavailability of Goods." *Bussey*, 531 So. 2d at 861.  The Alabama Supreme Court affirmed the lower court's entry of summary judgment in favor of John Deere.  The agreement pertaining to the dealer's construction of the new facility

17

was unenforceable under § 8-9-2(1), which governs agreements that by their terms are not performed within one year, because the relied-upon letters did not provide consideration.  They made "no reference to anything that John Deere agreed to do or refrained from doing in return for the building of the building other than continuing to enter into the written contracts . . . ." *Id.* at 863.  Because the letters "failed . . . to recite the consideration flowing from one side to the other, the letters c[ould not] form the basis of memorandums sufficient to take the alleged oral contract out of the statute of frauds." *Id.* (citation omitted); *see also Foy v. Foy*, 484 So. 2d 439 (Ala. 1986) (holding that the failure of an option agreement to contain a statement of the consideration rendered it void under the Statute of Frauds).

Here also, there is no "note or memorandum expressing the consideration" that Mr. Simmons would provide in exchange for Nutrien's alleged agreement to forgive his indebtedness.  *See* § 8-9-2(7).   The writing does not express what Mr. Simmons agreed to do or agreed to refrain from doing in return for having the debt cancelled if the soybean crop failed.  Mr. Smith's written promise to forgive the indebtedness is gratuitous.  The writing's failure to include an expression of consideration for the forgiveness of the debt voids the agreement under the statute of frauds.

Second, the signature on the steno page is "Brad Smith"; there is no reference to Nutrien, and no indication in the writing that Mr. Smith signed as a representative

of Nutrien.  Thus, the writing was not signed by Nutrien, which is the party to be charged with the contract.  Additionally, any argument that Mr. Smith signed as Nutrien's agent is also foreclosed by the evidence.  Mr. Simmons has not cited any evidence that Mr. Smith had written authority from Nutrien to forgive the debt.  Because the statute of frauds requires actual authority in a writing, Mr. Simmons cannot rely on the implied or apparent authority of Mr. Smith to bind Nutrien.  *See Cammorata*, 445 So. 2d at 872.

Mr. Simmons argues, however, that the writing satisfies the statute of frauds contained in Alabama's Uniform Commercial Code ("UCC"), Ala. Code § 7-2-201, which requires "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  Ala. Code § 7-2-201.  This argument is unavailing.

The UCC's statute of frauds does not apply because the agreement at issue is one for forbearance of a debt, not for the sale of soybean seeds.  *See Black's Law Dictionary* 537 (Abridged 8th ed. 2005) (defining "forbearance" as the "act of refraining from enforcing a right, obligation, or debt").  The soybean seeds already had been sold to Mr. Simmons on a credit account per the Contract, and the agreement was for the cancellation of the debt incurred for the credit sale.  Even if the agreement could be interpreted as one for the sale of goods, it likewise would

19

fail for lack of consideration.  Under the holding in *Bussey* and the express statutory terms, consideration is an essential element of the writing required to avoid the statute of frauds bar under both § 7-2-201 and § 8-9-2(7) of the Alabama code.  *See* 531 So. 2d at 863.

For the foregoing reasons, Mr. Smith's alleged agreement that Nutrien would cancel the debt owed for the soybean seeds if the crop failed violates § 8-9-2(7). Because the prerequisites for avoiding the operation of the statute of frauds are not in writing, the agreement is void.  Because the agreement is void, it cannot create a genuine dispute of material fact as to the amount of damages Mr. Simmons owes Nutrien under the Contract and invoices.

### 2.    *Mr. Smith's Alleged Oral Representations Pertaining to Price Matching and Zero Percent Interest for Six Months*

Mr. Simmons contends that, prior to entering into the Contract with Nutrien, Mr. Smith orally agreed to match the prices that Mr. Simmons could obtain from his Ohio suppliers and assured Mr. Simmons that his credit purchases would be part of "an interest free program for six (6) months."  (Doc. # 11, ¶ 10; *see also* Def. Dep., at 123, 132–33; 169–71; Doc. # 41, at 5; Doc. # 41-4.)  Mr. Simmons says that Nutrien's failed to honor these promises.  (Doc. # 41, at 5; Doc. # 38-1.)

Nutrien argues that the undisputed evidence establishes as a matter of law that Mr. Simmons's reliance on these alleged representations made by Mr. Smith was

not reasonable.  Nutrien argues that Mr. Simmons could not have reasonably relied on representations that were not terms of the Contract and invoices.  It contends further that Mr. Simmons could not have reasonably relied on an offer of zero percent interest when he knew he had to complete an application to determine his eligibility for the interest-free program.  Additionally, it contends that there was no valid contract between it and Mr. Simmons to enter into a contract for zero percent interest for six months because Mr. Simmons did not complete the application form for consideration for the interest-free program.  (Doc. # 44, at 9–13.)

Mr. Simmons offers nothing more than a bare assertion that Nutrien's failure to honor these promises creates a "factual dispute [that] is relevant to the amount of the claim asserted by Plaintiff."  (Doc. # 41, at 4–5.)  Mr. Simmons does not elaborate or cite any authority for his contention.  At bottom, Nutrien's unrefuted legal arguments have traction.

Under Alabama law, a purchaser generally "is not authorized to disregard the express terms of a written contract and rest a claim on fraud, claiming only that he relied on a statement contrary to the contract terms.  The purchaser's reliance upon a contrary statement, even if the statement is false, must be 'reasonable' under the circumstances." *Alpine Bay Resorts, Inc. v. Wyatt*, 539 So. 2d 160, 163 (Ala. 1988). "[T]he reasonable reliance standard imposes . . . on a plaintiff a general duty . . . to read the documents received in connection with a particular transaction." *Foremost*

*Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997).  Under the reasonable reliance standard, "a person cannot blindly rely on an agent's oral representations to the exclusion of written disclosures in a contract."  *Ex parte Caver*, 742 So. 2d 168, 173 (Ala. 1999).  "[A] plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents."  *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008); *see also Wood v. ADT LLC*, 327 So. 3d 224, 239 (Ala. Civ. App. 2020) (discussing the history of Alabama's reliance standard).

The evidence fails to show that Mr. Simmons's reliance on Mr. Smith's oral representations about guarantees of price matching and participation in the interest free program was reasonable.[4]  It is undisputed that Mr. Smith's oral representations were not terms of the Contract or the subsequent invoices.  The Contract provides that "[t]he terms of payment will be specifically indicated on your invoices."  (Doc. # 1-1, at 3.)  The written invoices undisputedly billed Mr. Smith in amounts that included interest and that did not include a price match, and those invoices did not

---

[4] This outcome is compelled whether Mr. Simmons is attempting to plead a defense or an untimely counterclaim.  Additionally, any attempt by Mr. Simmons to assert new counterclaims based on these theories comes too late.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment).  His pleading does not mention at all the price-matching theory, and it does not plead the interest-free theory as a separate counterclaim.  (*See* Doc. # 11.)

contain any terms along the lines of what Mr. Simmons says Mr. Smith orally promised. Mr. Simmons, who is college educated with multiple graduate degrees (including law and economics), easily could have discovered by reading the Contract, together with the invoices, that the bills reflected higher prices than he says he agreed to. Yet, Mr. Simmons's brief cites no evidence that he ever investigated or inquired about the discrepancies to protect his interest, nor did he contest the invoices when received. His failure to do so renders his reliance on Mr. Smith's oral representations unreasonable as a matter of law.

It also is undisputed that Mr. Smith provided Mr. Simmons with a copy of the application for the interest-free payment program, that Mr. Simmons received it, but that he did not complete and return the application. (Doc. # 44-1, at 2, 3–4; Def. Dep., at 284–85, 358–59, 284–85; Smith Dep., at 51–53.) Because Mr. Simmons did not apply for Nutrien's program offering zero percent interest for a period of six months on certain purchases, a basic element of a contract—"mutual assent to the terms essential to the contract," *Ex parte Holland Mfg. Co.*, 689 So. 2d 65, 66 (Ala. 1996)—is lacking. The absence of evidence as to a valid contract for Mr. Simmons's participation in the interest-free payment program is another reason why Mr. Simmons has not raised a genuine dispute of material fact on the damages element of Nutrien's claim that he breached the Contract.

**3.**    *Mr. Simmons's Damages Theory Based on an Acreage Overcharge for Products and Services*

Finally, Mr. Simmons contends that Nutrien overcharged him for application services, for fertilizer, for chemicals, and for soybean seeds based on an incorrect measurement of his farm's tillable acreage. It is undisputed that Nutrien charged by the acre for 1,100 acres, but Mr. Simmons contends that Nutrien should have charged him for 927 acres. His argument goes like this. "In May of 2018, Simmons believed that he had 1,250 tillable acres on his farm in south Montgomery County. In 2020, Simmons had his fields measured and learned that that he only had 927 tillable acres on his farm." (Doc. # 41, at 3 (citing Def. Dep., at 81, 189).) Hence, according to Mr. Simmons, Nutrien overcharged him for 173 acres that he did not have. (Doc. # 41, at 4–6.) Without citing any authority, Mr. Simmons concludes that this is another reason why there are "genuine, disputed material facts that will need to be resolved by the jury." (Doc. # 41, at 1.)

This argument has no traction because it conflicts with the number of acres—1,100—that the parties contemplated and agreed upon when the Contract was made. "[T]he damages claimed must be . . . such as may reasonably be supposed to have been within the contemplation of the parties at the time the contract was made.'" *Aldridge v. Dolbeer*, 567 So. 2d 1267, 1269–70 (Ala. 1990). There is no evidence that, when the Contract was made, the parties contemplated that the agricultural

24

services and goods Nutrien sold Mr. Simmons should have been based on 927 acres, and not based on 1,100 acres. As for Mr. Simmons, he does not dispute that, during the contractual period, he believed he had at least 1,100 tillable acres. He represented in the written Contract that he had 1,100 acres to farm, (Doc. # 1-1, at 2), an admission he cannot deny. He also testified that, prior to purchasing the property, he relied on the official records of the USDA Farm Service Agency ("FSA"), which assessed the property as having at least 1,100 farmable acres, and that he did not have the property independently surveyed. (Def. Dep., at 81.) As for Mr. Smith, there is no evidence that he possessed any contrary information about the size of the farmable acreage, nor that he agreed to, or was required to, verify the acreage information Mr. Simmons gave him.

It is undisputed that in March 2018, Mr. Smith received the FSA report from Mr. Simmons, and there is evidence that Mr. Smith relied on that report in calculating the acreage. (*See* Def. Dep., at 361–62; *see also* Doc. # 44-2, at 2.) There is no evidence to refute that *on the dates* Nutrien performed agricultural services for Mr. Simmons and sold him goods, the parties believed that the appropriate per-acre charge should be based upon 1,100 acres. Bottomline, Nutrien sold Mr. Simmons services and goods for 1,100 acres, and Mr. Simmons accepted the services and goods based on that acreage. Not surprisingly, Mr. Simmons cites no authority, and the court found none, to support his position that the parties' alleged mutual mistaken

belief as to the number of tillable acres on Mr. Simmons's farm is grounds to reduce the amount of damages.   This argument is insufficient to withstand summary judgment on the element of damages.

      **4.**    ***Summary***

In sum, each element of Nutrien's breach of contract claim is established by undisputed evidence, and Mr. Simmons has not raised a genuine issue of material fact that he has a defense to damages element of the breach-of-contract claim. Accordingly, Nutrien is entitled to summary judgment on its breach of contract claim for the debt Mr. Simmons owes under the terms of Contract and the invoices. Judgment will be entered in favor of Nutrien in the principal amount of $110,746.89, plus the accruing interest.   Reasonable attorneys' fees also will be awarded, and Nutrien, as requested, will be given leave leave to submit a motion seeking an award of attorneys' fees.   Because granting Nutrien's motion affords it all the relief it has requested—judgment in the amount of Mr. Simmons's indebtedness under the Contract and invoices, plus interest—it is unnecessary to address its arguments for summary judgment on the claims for amounts due under open account/account stated.

**D.**    <u>**Defendant's Counterclaims**</u>

Defendant brings a counterclaim for negligent misrepresentation and a second counterclaim for reckless misrepresentation.  (Doc. # 11, at 8–10.)  Under Alabama

law, negligent and reckless misrepresentation are not separate causes of action; rather, they are degrees of the same tort.  *See Montgomery Rubber & Gasket Co. v. Belmont Mach. Co.*, 308 F. Supp. 2d 1293, 1297 (M.D. Ala. 2004).  "The elements of a misrepresentation claim are 1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was reasonably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence." *Bryant Bank v. Talmage Kirkland & Co.*, 155 So. 3d 231, 238 (Ala. 2014) (citing *Foremost Ins. Co.*, 693 So. 2d at 421–22). "Reasonable reliance is shown if the circumstances are such that a reasonably prudent person who exercised ordinary care would not have discovered the true facts [sic]." *Sexton v. Bass Comfort Control, Inc.*, 63 So. 3d 656, 663 (Ala. Civ. App. 2010) (citation omitted) (alterations adopted).

According to Mr. Simmons's testimony, Mr. Smith told him that (1) farmers "only plant long season beans in Alabama" and that (2) planting long season beans in mid-June would yield Mr. Simmons a good harvest in November because "it doesn't rain in November." (Def. Dep., at 131.) Mr. Simmons cites the latter page of his deposition testimony as memorializing the substance of the misrepresentations underlying the counterclaims.[5] (Doc. # 44, at 3–4.) Nutrien argues that Mr.

---

[5] Nutrien contends that these alleged misrepresentations change the nature of the claim alleged in the counterclaims: The counterclaims plead that Mr. Smith misrepresented "the type of soybean seed that should be planted in Montgomery County," not that Mr. Smith misrepresented

Simmons cannot establish the first and second elements of his misrepresentation claims. (Doc. # 38, at 25.)  It contends that Mr. Simmons has not pointed to any evidence demonstrating that the first misrepresentation is material or false or that the second misrepresentation was made with the requisite intent to deceive.  The court agrees.

First, Mr. Smith's alleged statement that *Alabama* farmers only plant "long season" soybean seeds is not material to the extent that the statement refers to regions of Alabama other than Central Alabama where Mr. Simmons farmed.  The expert report Mr. Simmons cites for his statement that farmers in Alabama plant Group 4 soybeans—which are not "full season" soybeans, *see* Doc. # 41-2—demonstrates the point. (Doc. # 41, at 2 (citing Doc. # 38-8, at 7).)  In that report, Nutrien's expert, who holds a Ph.D. in agronomy, narrowed the geographical region for Group 4 planting to "some Northern Alabama farms . . . ."  (Doc. # 38-8, at 7.)  But Central Alabama is at issue here.  The statement is material as to the type of soybean seeds farmers plant in Central Alabama, but that part of the statement is not false. Nutrien's expert also testified that for a "late planting" (mid-to-late June) in Central Alabama, the type of seed sold to Mr. Simmons—a Group 6 or "full season" seed—

---

"the type of soybean seed sold in <u>Alabama</u> as a whole." (Doc. # 44, at 3.)  Nutrien argues that, under the heightened pleading standard applicable to fraud claims, Mr. Simmons should not be permitted to "change his whole theory of liability in response to summary judgment without amending his pleadings . . . ." (Doc. # 44, at 3–4.)  As discussed, the counterclaims—either as pleaded or as Mr. Simmons recollected at his deposition—cannot survive summary judgment; thus, it is not necessary to resolve Nutrien's argument.

was preferred and appropriate.  (Doc. # 38-8, at 6.)  Nothing in Mr. Simmons's brief or in the evidence he cites creates a genuine dispute of material fact on this point.

Second, Mr. Simmons has not raised a genuine dispute of material fact that Mr. Smith intended to deceive Mr. Simmons when he assured Mr. Simmons of a productive soybean crop and told him that the weather conditions for harvesting in November would be dry.  "A fraud action based upon a promise of future performance must be based on evidence that the defendant intended to deceive the plaintiff."  *Crowne Invs., Inc. v. Bryant*, 638 So. 2d 873, 877 (Ala. 1994).  Mr. Smith's statement contains two separate but related promises.

As to the first prediction of a dry November, the evidence is that November 2018 turned out to bring "unusually wet weather" and that other farmers "suffer[ed] losses in both yield and quality in the late fall of 2018."  (Doc. # 38-8, at 6.)  There is no evidence of deceptiveness in Mr. Smith's prediction months in advance of how the weather would affect harvesting based on normal patterns.

As to the second prediction, Mr. Smith recommended planting "full season" soybean seeds because he believed that planting "short season" soybean seeds in mid-June 2018 would have resulted in the plants not being of sufficient height to be harvested.  (Smith Dep., at 71–73.)  Mr. Simmons has not pointed to any evidence that casts aspersions on Mr. Smith's asserted belief.  To the contrary, Mr. Simmons testified that he believed Mr. Smith's recommendation was well intended.  At his

deposition, Mr. Simmons testified that he thought Mr. Smith "was trying to help" him when he made the recommendation to plant "full season" soybean seeds. (Def. Dep., at 205–06.)  Additionally, Mr. Simmons was asked, "[S]o you believe when he [Mr. Smith] was talking to you, he honestly believed that he was telling you the truth?"  Mr. Simmons answered, "That's what I feel, yes, sir."  (Def. Dep., at 206.)

Mr. Simmons' counterclaims for misrepresentation cannot survive summary judgment on this evidentiary record.

## V.  CONCLUSION

The evidence establishes that Mr. Simmons is liable to Nutrien for breach of contract in the principal amount of $110,746.89, with an interest rate of eighteen percent per annum, as well as for reasonable attorneys' fees and costs.  Mr. Simmons offered no evidence to controvert Nutrien's assertions or the evidence in the record. Nutrien also is entitled to summary judgment on Mr. Simmons's counterclaims for negligent and reckless misrepresentation.   Accordingly, it is ORDERED that Nutrien's motion for summary judgment (Doc # 37) is GRANTED.

It is further ORDERED that Nutrien shall file a motion for attorneys' fees and costs and a brief in support of the motion, on or before **August 30, 2022**.  Mr. Simmons shall file a response to the motion no later than ten days after Nutrien files its motion.

It is further ORDERED that on or before **August 30, 2022**, Nutrien shall file

its proposed interest calculation and provide supporting documentation for a finding

as to the date upon which such interest should accrue and end.  Any objection to that

calculation shall be filed no later than ten days after Nutrien's filing.  Judgment will

be entered after interest and attorneys' fees have been determined.

DONE this 10th day of August, 2022.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE